UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| AMANDA LOCKE, ) | Civil Action No.: 4:20-cv-02050-TER |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| -vs- ) | |
| ) | |
| KILOLO KIJAKAZI,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for child disability insurance benefits and supplemental security income (SSI). Plaintiff turned 18 before the application date and claimant's representative stipulated it was an adult case. (Tr. 15). The ALJ appropriately performed the Five Step analysis for adults and not the Eight Step Analysis for children. (Tr. 26). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

**I.   RELEVANT BACKGROUND**

**A.     Procedural History**

As history, Plaintiff was originally granted benefits in 2010 with a 2006 onset date, as she met Listing 112.11. (Tr. 150). When she turned 18, a redetermination under adult standards was

---

[1] Recently, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), she is automatically substituted for Defendant Andrew Saul who was the Commissioner of Social Security when this action was filed.

required. Benefits were ceased as of May 2016. (Tr. 150). Plaintiff did not attend the hearing for that case. (Tr. 151). A finding of insufficient evidence was made in December 2016 and benefits were ceased. (Tr. 151-155). Plaintiff then made the current 2017 application that is before the court.

Plaintiff filed an application on May 31, 2017 and May 11, 2017, alleging disability beginning on December 31, 2006. (Tr. 15). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on May 22, 2019, at which time Plaintiff and a vocational expert (VE) testified. (Tr. 15). At the hearing, Plaintiff's representative discussed amending the onset date to the appliction date but no amended onset date change form was submitted. (Tr. 15). The ALJ therefore adjudicated the complete period of the claimant's claims as of her 18th birthday in November 2015. (Tr. 15). The Administrative Law Judge (ALJ) issued an unfavorable decision on July 1, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 15-26). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request for review. On May 31, 2020, Plaintiff filed this action. (ECF No. 1).

**B.      Plaintiff's Background and Medical History**

Plaintiff was born on November 16, 1997, and was nine years old at the alleged onset date. (Tr. 25). Plaintiff had no past relevant work. Plaintiff alleges disability originally due to intermittent explosive disorder, ADD, migraines, and trouble learning. (Tr. 107).

Mental Health closed their file in 2014 because of no participation and no contact. There were problems with Plaintiff's mother's health and transportation. (Tr. 383).

**2015**

The first quarter report card of Plaintiff's last year of high school noted "D"s in Nail

Technology and Access Environmental Studies; she failed to turn in assignments and to work to potential. Plaintiff had a 96 in Art. (Tr. 351). In the second quarter, Access Environmental Studies dropped to 59 and Art dropped to 73. Total absences were 27. (Tr. 352).

There are no other records for the year 2015.

**2016**

On February 17, 2016, Plaintiff was seen by NP Sanders. (Tr. 368). Plaintiff reported a history of depression and ADD. (Tr. 368). Plaintiff was to schedule with a different provider for workup of ADD. (Tr. 369).

On March 1, 2016, Dr. Moody, Ph.D., an examining consultant, administered five tests and an interview. (Tr. 355-362). Plaintiff was not yet back on prescription medication at this exam. Dr. Moody only reviewed records of a 2008 exam. (Tr. 355). Plaintiff's mother(referred to as such but not Plaintiff's biological mother) stated as to the reason for the application that she was already getting benefits since she was about 10 for ADHD and learning abilities. (Tr. 355). Plaintiff's non-biological mother stated Plaintiff's father did not allow Plaintiff's biological mother to give birth in a hospital and there was no known information about prenatal development. Plaintiff was left in the care of her father when she was one. (Tr. 356). Plaintiff's father has a long history of mental illness and violence. (Tr. 356). Plaintiff's mother stated Plaintiff was in speech therapy for six years. ADHD medication helped to some extent. (Tr. 356). "However, she is not currently prescribed medication but has plans to see a physician tomorrow regarding treatment for attention problems." Plaintiff reported she was unorganized, forgetful, and loses things. Plaintiff becomes hyperfocused visually especially in front of the television. At the interview, Plaintiff was somewhat fidgety with rapid speech at times. Plaintiff's mother reported Plaintiff hits herself a lot. Plaintiff becomes

3

verbally aggressive, screaming. Plaintiff's mother reported police have been called, but Plaintiff was never arrested. Plaintiff's mother reported Plaintiff punched and slapped her. (Tr. 356). Plaintiff's mother allowed Plaintiff's 40+ year old "boyfriend" to live with them when Plaintiff was 14-15 years old. DSS removed Plaintiff from the home after abuse began by him and he was criminally charged. Plaintiff refused to speak about that and began crying. (Tr. 356). As to Plaintiff's mood, Plaintiff reported she was "mostly alright" but had been mad a couple of times. Plaintiff's mother reported her mood as depressed and that she slept over twelve hours a day. (Tr. 356). Plaintiff denied any ideations, delusions, or hallucinations. (Tr. 357). Plaintiff reported one hospitalization when she was 12-13 for suicidal ideations. Plaintiff was not currently on medication; in the past, Plaintiff had been prescribedProzac, Trazodone, and Vyvanyse. The medication was helpful in symptom control of ADHD and was to be sought again the next day. (Tr. 357). Counseling was minimally helpful. Plaintiff admitted to self-harming behaviors of hitting. (Tr. 357). Plaintiff was a senior in high school at the time of the exam. Plaintiff was in special education self-contained classes and would receive a certificate of completion. (Tr. 357). Plaintiff had impulsive behaviors and once cut a peer's hair during class. (Tr. 357). Plaintiff's father has no visitation rights. (Tr. 358). Plaintiff had a history of abuse and trauma. (Tr. 358). Plaintiff was a member of the National Historical Art society at school. (Tr. 358). Plaintiff's hygiene was good. (Tr. 359). At times, her speech was rapid. "She had a slight articulation issue, but it was hardly unnoticeable." "Her affect was wide, but she cried when her past abuse was discussed." Plaintiff's mood was normal overall. Plaintiff had distractible thought processes. Plaintiff made comments about things she saw which distracted her from the conversation. Memory and concentration were very poor. Judgment and insight were somewhat limited. Plaintiff's mini mental score was 20/30. Plaintiff identified 2/3 items on delayed recall. Plaintiff did not know

the county. (Tr. 359). Plaintiff had a full scale IQ of 76. (Tr. 359). On the WRAT, Plaintiff's sentence comprehension was grade equivalent to 2.8. "Her concentration is obviously impaired and she was distracted during the interview. By her self-report, she admitted that she is forgetful and loses things." Because of those symptoms, a diagnosis of ADHD inattentive type was suggested. (Tr. 360-361). "It is unclear if she has a mood disorder or if she has symptoms more consistent with [PTSD], but this diagnosis should be considered." (Tr. 361). Plaintiff's verbal and nonverbal abilities fell within the borderline range. Plaintiff's "test scores show a borderline level of intelligence. However, she has a significant weakness in concentration/attention which explains why her education has been so difficult. She has a previous diagnosis of ADHD which appears consistent with this score. However, she is unmedicated at this time and could benefit from medication treatment." (Tr. 361). As to limitations, Dr. Moody opined that Plaintiff's "attention and concentration are extremely impaired. She cannot carry out simple instructions. Her pace and persistence are also strongly impacted by her concentration and attention." (Tr. 362).

On March 2, 2016, Plaintiff was seen by Dr. Menezes. (Tr. 370). Plaintiff had been on medications for depression and ADHD in the past but had not seen mental health in about 7-8 months. Plaintiff denied any symptoms except for headaches. Plaintiff reported depression under review of symptoms. (Tr. 370). There was no mental exam. Plaintiff was referred to mental health for ADHD. Prozac was prescribed. (Tr. 371).

On May 11, 2016, Plaintiff restarted with mental health. (Tr. 389). Plaintiff reported needing ADD medications and having a lot of anger outbursts. Plaintiff admitted she had been abused. (Tr. 389). Plaintiff wanted to be a nail tech. (Tr. 390). Plaintiff s goal was to get on medications and "start not yelling." (Tr. 391). Upon exam, Plaintiff had cooperative attitude, happy mood, normal

5

thought process/content, and intact memory. (Tr. 391). Plaintiff was usually able to make sound decisions. (Tr. 391). Plaintiff was easily distracted. (Tr. 392). Plaintiff reported being irritable, sleeping too much, no ambition, unmotivated, and often tired. Plaintiff's guardian insisted Plaintiff had ADD and needed Vyvanse. It was explained this needed to be discussed with the doctor. (Tr. 392).

On August 24, 2016, Plaintiff was discharged from mental health because she moved. (Tr. 394). Current medications were trazodone and Vyvanse. (Tr. 394).

**2017**

In May 2017, Plaintiff had face-to-face SSA contact. Plaintiff had difficulty understanding, talking, and answering. (Tr. 275). Plaintiff was child-like. Plaintiff had dirty nails despite a passionate interest in getting her nail tech license. Plaintiff talked really fast and had a bit of a speech impediment, but it did not prevent the SSA staff from understanding her. Plaintiff was friendly, polite, and apologetic for not completing a form, saying she did not understand it. (Tr. 276).

On June 1, 2017, Plaintiff was seen by mental health. (Tr. 399, 422, 426). Diagnosis was unspecified depressive disorder. (Tr. 399). Plaintiff's listed complaint was to get back on medication, "helps me concentrate, get stuff off my chest." Plaintiff reported poor focus, depression, anxiety, anger issues, and learning problems. "I've been told by many people it will be hard for me to work because I have anger issues and will snap at people." (Tr. 400). Plaintiff reported her family states she "does better" on medication. (Tr. 400). Plaintiff reported wanting to get her nail tech license. (Tr. 403). Plaintiff had volunteered at the humane society. (Tr. 403). Upon exam, Plaintiff had child-like attitude, expansive affect, euphoric mood, poor judgment/insight, and mild impairment in memory. Plaintiff had calm behavior, playing with a fidget spinner. Plaintiff was

easily distracted. (Tr. 405). Plaintiff reported she had never assaulted someone. (Tr. 405). Plaintiff reported her symptoms started after being abandoned and then being moved around between caretakers. (Tr. 405). Plaintiff's goal was to stay on medication to keep her temper under control. (Tr. 406). Plaintiff was immature in her presentation. (Tr. 406).

On July 12, 2017, Plaintiff completed an adult function report. (Tr. 294). Plaintiff reported that she cannot work because she misunderstands people. Because of her anger issues, she gets frustrated easily. Plaintiff purports that she is easy to take advantage of and she has a low reading and comprehension level. (Tr. 286). Plaintiff takes care of her pets. (Tr. 288). Plaintiff has no problem with personal care. (Tr. 288). Plaintiff needs reminders to take medication. Plaintiff can do chores. (Tr. 289). Plaintiff reported she likes to knit, crotchet, and sew. Plaintiff plays video games and watches YouTube. Plaintiff loves to draw and paint. (Tr. 291). Plaintiff goes to church and the park. (Tr. 291). Plaintiff reports she has always been like this since she was little. Plaintiff forgets to finish tasks or gives up. Others get on her nerves. (Tr. 292). Plaintiff reports no problem with authority and that she can follow instructions, but it just takes longer. Plaintiff reported she used to be on medication, lost her doctor, and now is trying to be put back on medication. (Tr. 294).

On a different form, Plaintiff reported in July 2017 her depression, mood swings, and insomnia had worsened. (Tr. 307). Plaintiff made a similar report of changes in September 2017. (Tr. 316). Plaintiff reported she had anger outbursts and needed to be reminded to shower. (Tr. 310).

On July 26, 2017, Dr. Steadham, Ph.D., a non-examining state agency consultant reviewed the record and found that Dr. Moody's statements were not persuasive because it was not consistent with her functional abilities and was not supported by objective testing. (Tr. 84). Plaintiff could understand/remember simple instructions but would have difficulty with complex instructions. (Tr.

7

86). Plaintiff could attend to and perform simple, unskilled tasks for reasonable periods of time without special supervision. (Tr. 87). Plaintiff would do best working alone or in small groups and with limited contact with the public. Plaintiff could interact appropriately with supervisors and coworkers. (Tr. 87). Plaintiff could make simple work-related decisions. Plaintiff would do best with routine tasks and few demands for change and with pre-set goals and objectives. (Tr. 88). On October 3, 2017, Dr. Ward, Ph.D. affirmed this assessment. (Tr. 114-118).

On August 1, 2017, Plaintiff was seen by mental health. Plaintiff was there with her father, who by Dr. Moody's exam was alleged to have abused Plaintiff in the past. (Tr. 420). Plaintiff was cared for by her stepmother for many years then moved in with her father. Plaintiff had training for nail care. Plaintiff was supposed to take a test and was sent the money for the test, but then her stepmother kept the money. (Tr. 420). Plaintiff needed medication that helped her pay attention and be less irritable. (Tr. 420). Plaintiff had been without medication. (Tr. 420). Upon exam, Plaintiff had intact attention/concentration, euthymic mood, and good insight/judgment. (Tr. 421). Plaintiff was referred for Vyvanse as Plaintiff and her father notice great improvement when Plaintiff is able to take it. Plaintiff was given "second line Wellbutrin XL to aid in her need to concentrate and have a better mood." (Tr. 421).

On November 1, 2017, Plaintiff was seen by mental health for anger problems. (Tr. 418). Upon exam, Plaintiff had calm behavior, logical thought process, angry irritable mood, intact memory, and mild impairment in attention. (Tr. 418).

**2018**

On January 29, 2018, Plaintiff reported she did not fill Lamictal because her father was getting remarried and they did not have enough money. Plaintiff reported her mood was generally

good. Plaintiff was upset she had a puppy that died after a few days; someone may have poisoned it. Upon exam, Plaintiff had unkempt appearance and signs of poor personal hygiene. Plaintiff had calm behavior, mild speech impediment, euthymic mood, intact attention/concentration, intact memory, and fair judgment/insight. (Tr. 416).

On May 4, 2018, Plaintiff was seen by mental health. Plaintiff's mother reported how well she was doing; it was the difference between night and day as to mood stability. Plaintiff's medications were Lamictal and Trazodone. (Tr. 414). Upon exam, Plaintiff had an unkempt appearance. (Tr. 414). Plaintiff had calm behavior, logical thought process, euthymic mood, appropriate affect, good judgment/insight, intact memory, and intact attention/concentration. (Tr. 414).

On July 9, 2018, Plaintiff was seen by mental health. Plaintiff reported continuing to do well on her current medication regimen. "Her mood has been stable." "She is bright in affect and is discussing her pleasure in caring for her dogs." (Tr. 412). Upon exam, Plaintiff had calm behavior, logical thought process, euthymic mood, appropriate affect, intact memory, intact attention/concentration, and good judgment/insight. Diagnosis were major depressive disorder, recurrent episode, moderate and ADHD, predominantly inattentive presentation. (Tr. 412).

On October 9, 2018, Plaintiff was seen by mental health. Plaintiff continued to do well on her current medication. Plaintiff's mood was stable. Plaintiff was bright in affect and discussed pleasure in caring for toddler relatives. Plaintiff felt trazodone was no longer helpful for sleep. (Tr. 436). Upon exam, Plaintiff had euthymic mood, intact memory, intact attention/concentration, and good insight/judgment. (Tr. 436).

**2019**

On January 11, 2019, Plaintiff was seen by mental health. Plaintiff had bright affect and was calm and cooperative. Plaintiff stated Lamictal was especially helpful in keeping her mood level and she no longer has anger outbursts. It was unclear if she was taking Remeron. (Tr. 435). Upon exam, Plaintiff had calm behavior, euthymic mood, intact memory, intact attention/concentration, and fair judgment/insight. (Tr. 435).

In March 2019, Plaintiff reported medication of lamotrigine for anger control. (Tr. 334).

**Hearing Testimony**

In May 2019, Plaintiff, represented by an attorney, testified at a hearing before ALJ Alice Jordan. Plaintiff's attorney noted the prior final adjudication of cessation of benefits. (Tr. 38). The filing date was discussed to be the amended alleged onset date but a form was not completed. (Tr. 39). Plaintiff was twenty-one years old at the hearing. (Tr. 39). Plaintiff lives with her grandmother, sisters, brother, father, and mother. (Tr. 40). Plaintiff had no insurance. (Tr. 41). Plaintiff testified she did not have any training after high school. (Tr. 42). During the day, Plaintiff plays with her phone, watches Netflix, or plays with her sister. (Tr. 43). Plaintiff sometimes visits a friend. Plaintiff goes to church once every other week. (Tr. 43). Plaintiff can do chores but must be reminded. (Tr. 44). Plaintiff can babysit her three siblings. (Tr. 45). Plaintiff gets too frustrated looking at the driving license test online. (Tr. 45). Plaintiff draws, paints, knits, and crotchets. (Tr. 45). Plaintiff learned to knit while in DSS custody. (Tr. 45). Plaintiff will go to the park with her family. (Tr. 46). Plaintiff takes care of her hygiene but sometimes must be reminded. (Tr. 46). Anger was Plaintiff's most severe problem. (Tr. 47). Plaintiff gets frustrated if she does not understand how to do something. (Tr. 48). If someone tells her to do something but does not say how, she gets very frustrated and this happened with nail tech class. (Tr. 49). Plaintiff reported she had a little bit of

depression when something happens like a death in the family. Plaintiff isolates. (Tr. 50). Plaintiff hits herself when she has anger spells. (Tr. 51-52). Plaintiff reported she had problems concentrating: "If I'm supposed to be doing one thing, I will lollygag around and not do it, and it takes me a longer time to get finished with it." (Tr. 52). Plaintiff hides when there are new people around. (Tr. 53). Plaintiff testified that nail tech class was part of her public school education. (Tr. 54). Plaintiff was in all self-contained classes. (Tr. 56).

**C.     The ALJ's Decision**

In the decision of July 1, 2019, the ALJ made the following findings of fact and conclusions of law (Tr. 15-26):

1. Born on November 16, 1997, the claimant had not attained age 22 as of December 31, 2006, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since December 31, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: borderline intellectual functioning, depression, ADHD, specific learning disability with impairment in reading, reading comprehension and spelling (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant could follow simple, routine instructions and could maintain concentration, persistence and pace for at least a two hour period during an eight-hour day for a total of eight hours with regular breaks every two hours for simple, routine, repetitive tasks. The claimant can have no more than

occasional contact with the general public and no more than frequent contact with co-workers.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 16, 1997 and was 9 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in the RFC determination by finding that Plaintiff had a moderation limitation in ability to maintain concentration, persistence, and pace but failed to explain how that limitation was consistent with the RFC of ability to perform simple, routine, and repetitive tasks for two-hour increments. Plaintiff argues the ALJ erred in evaluating Dr. Moody's opinion; the standard at this application date is persuasiveness. Defendant argues the ALJ's findings were supported by substantial evidence.

### A.     LEGAL FRAMEWORK

#### 1.     The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner

are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.     ANALYSIS**

**RFC**

Plaintiff argues the ALJ did not explain the RFC conclusion that Plaintiff could maintain concentration, persistence, and pace for two hour increments in light of the previously found moderate limitations at an earlier step.

15

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c). In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* Additionally, " 'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.' " *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

Under *Mascio*, once an ALJ has made an earlier finding that a claimant suffers from moderate difficulties in concentration, persistence, or pace, the ALJ must either include a corresponding limitation in the RFC assessment or explain why no such limitation is necessary. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). The Fourth Circuit held that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the RFC or the hypothetical question to the vocational expert to simple, routine tasks or unskilled work. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015); *see also Winschel v. Comm'r of Soc. Sec.*,631 F.3d 1176, 1180 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (per

curiam); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). "As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence, or pace." *Id.* at 638. The functional area of "concentration, persistence and pace" refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate" completion of work. 20 C.F.R. pt. 404, Subpart P, App. 1 § 12.00(c)(3).

While the RFC here does contain the additional limitation that Plaintiff was limited to "simple, routine instructions and could maintain concentration, persistence and pace(CPP) for at least <u>a two hour period</u> during an eight-hour day for a total of eight hours with regular breaks every two hours for simple, routine, repetitive tasks," the ALJ does not explain, in accordance with SSR 96-8p, how the ALJ arrived at this particular finding and how such relates to the moderate CPP limitation previously found at an earlier step. (Tr. 21). The ALJ does not discuss how she determined that Plaintiff could stay on task for two hour increments, as opposed to one hour increments or three hour increments.[4] *Morgan v. Saul*, No. CV 9:19-1390-BHH-BM, 2020 WL 3318630, at *3 (D.S.C. June 3, 2020), *report and recommendation adopted*, 2020 WL 3316089 (D.S.C. June 18, 2020);*Woods v. Berryhill*, 888 F.3d at 686, 694 (4th Cir. 2018) ["[T]he ALJ must both identify evidence that supports his conclusion and build an accurate and logical bridge from the evidence to his conclusion"], *citing Monroe*, 826 F.2d at 189 (internal quotations omitted); *Pearson v. Saul*, No. CV 9:19-1215-DCC-BM, 2020 WL 1644616, at *4 (D.S.C. Feb. 28, 2020), *report and*

---

[4] Further, there is no opinion in the record here by any physician, whether non-examining, examining, or treating as to any specific two hour period delineation. Plaintiff argues the opinion of "reasonable periods of time" by a non-examining state agency physician does not provide support for two hours without explanation by the ALJ. (ECF No. 18 at 24).

*recommendation adopted*, 2020 WL 1640318 (D.S.C. Apr. 1, 2020). It is not clear whether substantial evidence supports the ALJ's findings. The court cannot meaningfully review the ALJ's decision here where the court is left to guess how the ALJ arrived at the conclusion of the two hour increment limitation.

As to Plaintiff's argument that two hour increment RFCs, even if supported by substantial evidence and a reasonable explanation, could never provide an accommodation for moderate limitations in CPP because it equates to a normal workday,[5] an ALJ's finding of a normal workday in addition to other limitations may not be error under *Mascio* as long as supported by substantial evidence in the record, such as a physician finding the same. *See Shinaberry v. Saul*, 952 F.3d 113, 121-123 (4th Cir. 2020)(finding an RFC of only simple, routine, and repetitive tasks without any hour increment findings accounted for claimant's moderate CPP limitations where the ALJ "discussed in detail the psychological evaluations performed by the SSA psychological consultants and Dr. Burlingame, as well as Shinaberry's adult function report, and sufficiently explained" why the RFC accounted for moderate CPP limitations); (ECF No. 18 at 21); *Norris-Gremillion v. Saul,* No. 9:19-CV-917-TMC, 2020 WL 6737669, at *3-4 (D.S.C. Nov. 17, 2020)(discussing an ALJ's reliance on two opinions of two hour limitation and finding no *Mascio* error). Remand here should not be read to be based on this part of Plaintiff's argument.

The court looks to whether the ALJ explained in the RFC narrative the reasons for the <u>specific</u> limitations given in the RFC and any explanation regarding how such determination does account for the previously found limitations in concentration, persistence, and pace. *Mascio*, 780 F.3d at 638. The court finds the ALJ's discussion of Plaintiff's limitations relating to moderate

---

[5] *See* SSR 96–9p.

difficulties in concentration, persistence, and pace are insufficient because without the ALJ's explanation as to the two hour delineation, the court is left to guess about how the ALJ determined that the RFC finding accounted for the earlier found moderate limitations in concentration, persistence, and pace. *See Mascio*, 780 F.3d at 637. Further, the ALJ does not explain his reasoning or what information supports two-hour increments. There may be substantial evidence to support the ALJ's findings and conclusions; however, the court is unable to conduct a proper review as presented.

The case is remanded for the ALJ to explain how the RFC accounts for limitations in concentration, persistence, and pace. The decision should make clear that the ALJ considered Plaintiff's limitations in concentration, persistence, and pace and provide substantial evidence underlying the ALJ findings. It does not do so here, and thus precludes this court from meaningful review. In light of the court's finding that this matter should be remanded for further consideration, the court need not address Plaintiff's remaining issues related to opinions. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the ALJ should address all of Plaintiff's remaining issues and evaluate those in accordance with the applicable law, regulations, and policies.[6]

## CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Accordingly, pursuant to the power of the Court to enter a judgment affirming,

---

[6] There has been a citation to supplemental authority filed recently and there was no argument as to its applicability to this case.

modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.

s/Thomas E. Rogers, III  
Thomas E. Rogers, III  
United States Magistrate Judge

August 11, 2021  
Florence, South Carolina